Betty D. TULLOCK *v.* Gareth ECK, M.D., et al.

92-340                                    845 S.W.2d 517

Supreme Court of Arkansas
Opinion delivered January 25, 1993
[Rehearing denied March 1, 1993.]

*F. Lewis Steenken* and *Miller, Nash, Wiener, Hager & Carlsen*, by: *William H. Walters*, for appellant.

*Davis, Cox & Wright*, by: *Kelly Carithers*, for appellee.

DAVID NEWBERN, Justice. This is a medical malpractice case. The appellant, Betty Tullock, sued the appellee, Dr. Gareth Eck, along with another physician and the medical center in which they work. Ms. Tullock contended Dr. Eck negligently prescribed estrogen on November 30, 1987, and that her taking of the drug contributed to her advanced state of breast cancer diagnosed in March 1990. Dr. Eck was awarded summary judgment on the ground that the two-year statute of limitations had expired. Ms. Tullock argued that her taking the medication prescribed by Dr. Eck constituted a continuous course of treatment and the last allegedly negligent act occurred when she finished taking the medication in May 1989, less than two years before suit was filed. The summary judgment order has been properly certified as final pursuit to Ark. R. Civ. P. 54 (b). We agree with the Trial Court's conclusion that the continuous

treatment doctrine did not toll the statute of limitations, and thus summary judgment in favor of Dr. Eck was proper.

Affidavits, discovery documents, pleadings, and exhibits revealed these facts. Dr. Eck performed gall bladder surgery on Ms. Tullock November 2, 1987. On November 10, 1987, Ms. Tullock, in the course of a post-operative examination, reported to Dr. Eck a mass in her breast. Dr. Eck recommended a mammogram and biopsy, and a mammogram was performed. The mammogram report confirmed the mass but did not show the presence of cancerous cells.

According to Dr. Eck, when Ms. Tullock returned for a second post-operative visit November 30, 1987, he informed her that the mammogram was essentially negative but repeated that a biopsy of the mass was indicated. Ms. Tullock declined to have a biopsy and denies having been fully informed of the risks and alternatives concerning her choice with respect to a biopsy in 1987.

A subsequent post-operative visit was scheduled for December 14, 1987. Dr. Eck states it was his intention to discuss further with Ms. Tullock the need for a biopsy at that meeting. His office records show that Ms. Tullock called to cancel the appointment and did not reschedule it. While Ms. Tullock acknowledges she was to return, she states she did not do so because she had been told her gall bladder situation was healed, and she had been led to believe the breast mass was benign.

At the November 30, 1987, visit Dr. Eck wrote a prescription for Ms. Tullock for the drug Premarin, an estrogen supplement, which Ms. Tullock filled that day. Hospital records compiled subsequently when Ms. Tullock underwent a mastectomy showed she had been taking estrogen since 1973. Dr. Eck's prescription permitted refills for one year. She refilled the prescription on June 9, 1988, and November 10, 1988, thus providing sufficient medication to last into May 1989, well within the two years of the filing of this suit on December 11, 1990. A pharmacist called Dr. Eck's office for authorization of an additional refill on May 9, 1989, and it was refused.

In June 1989 Ms. Tullock visited another doctor who did not

perform diagnostic treatment on the breast mass but continued her estrogen therapy. The same doctor diagnosed a malignant infiltrating ductal cell breast cancer in March 1990. Ms. Tullock's next direct contact with Dr. Eck occurred on March 30, 1990, when after that diagnosis, she returned to him for the biopsy.

In the process of treatment, the cancer was found to be estrogen dependent, and Ms. Tullock argued that Dr. Eck's prescription of estrogen in the face of the undiagnosed mass presenting at the time of the examination was negligence. She alleged Dr. Eck was also negligent in his acts and omissions related to the diagnosis and treatment of her cancer, thus contributing to the loss of an opportunity for a cure and significantly shortening her life expectancy.

### 1. Summary Judgment

#### a. Standard of review

The burden of sustaining a motion for summary judgment is always the responsibility of the moving party. *Cordes* v. *Outdoor Living Center, Inc.*, 301 Ark. 26, 781 S.W.2d 31 (1989). All proof submitted must be viewed in a light most favorable to the party resisting the motion and any doubts and inferences must be resolved against the moving party.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ark. R. Civ. P. 56(c). While there might well have been disputed issues of negligence had this case gone to trial, the only issue with which we are concerned is whether the statute of limitations was tolled by continuous treatment. As to the latter, there is no factual dispute. The question is thus whether Dr. Eck was entitled to judgment as a matter of law.

#### b. Statute of limitations

If a physician is negligent in treating a patient but the patient continues to be treated by the physician for the condition which was the object of the negligent act or treatment, the patient

should not be required to interrupt the treatment to bring suit against the physician because a statute of limitations is about to run. That is the most often stated rationale for the "continuous treatment doctrine" which tolls the statute of limitations until treatment is discontinued. *See, e.g., Lane* v. *Lane,* 295 Ark. 671, 752 S.W.2d 25 (1988); *Rountree* v. *Hunsucker,* 833 S.W.2d 103 (Tex. 1992).

We have found no authority to support the conclusion that a patient's continued ingestion of medicine prescribed by a physician is enough to establish an on-going course of treatment for the purpose of applying the continuous treatment doctrine. We find only authority suggesting the contrary. *See, Fleishman* v. *Richardson-Merrill, Inc.,* 226 A.2d 843 (N.J. Super. 1967); *Parrott* v. *Rand,* 511 N.Y.S.2d 57 (A.D.2 Dept. 1987); *Bernardo* v. *Ayerest Laboratories,* 470 N.Y.S.2d 395 (A.D.1 Dept. 1984) and *Millbaugh* v. *Gilmore,* 30 Ohio St.2d 319,285 N.E.2d 19 (1972); *Rountree* v. *Hunsucker, supra.*

All of these cases from other jurisdictions are distinguishable, some of them very significantly so. None of them is precisely like the case before us now combining (1) the allegedly negligent prescription of a drug which allegedly directly caused injury with (2) a very strict statute of limitations limiting action to two years from the date of a wrongful "act complained of and no other time." We have found no case just like this one where the question is whether the final "treatment" ("act") occurred the date the prescription was issued by the physician or the last time the medicine was taken by the patient under the aegis of that prescription. We thus find it necessary to go our own way, looking to the Arkansas statute and the two cases in which we have applied the continuous treatment doctrine in conjunction with it.

The statute is Ark. Code Ann. § 16-114-203 (1987). Here are its relevant words:

(a) Except as otherwise provided in this section, all actions for medical injury shall be commenced within two (2) years after the cause of action accrues.

(b) The date of the accrual of the cause of action shall be the date of the wrongful act complained of and no other time. . . .

Ms. Tullock argues that the actions of Dr. Eck in failing to biopsy the mass, prescribing estrogen, and failing to provide the requisite follow-up care fall within the continuous treatment doctrine. We recognized and applied the doctrine first in *Lane* v. *Lane, supra.*, and again in *Taylor* v. *Phillips*, 304 Ark. 285, 801 S.W.2d 303 (1990).

In the *Lane* case, narcotic injections given by Dr. Lane to Ms. Lane, his wife, over a long period of time resulted in scarring and drug addiction. Dr. Lane pleaded the statute of limitations, and the Trial Court refused to bar the claim though the initial injurious behavior occurred more than two years before suit was filed. We affirmed, quoting a description of the continuous treatment doctrine from 1 D. Louisell and H. Williams, *Medical Malpractice*, § 13.08 (1982)(footnotes omitted), as follows:

> [I]f the treatment by the doctor is a continuing course and the patient's illness, injury or condition is of such a nature as to impose on the doctor a duty of continuing treatment and care, the statute does not commence running until treatment by the doctor for the particular disease or condition involved has terminated — unless during treatment the patient learns or should learn of negligence, in which case the statute runs from the time of discovery, actual or constructive.

That description has two fundamental elements. There must be "treatment," which "is a continuing course." That requirement is stated conjunctively with the second element, "the patient's illness, injury or condition is of such a nature as to impose on the doctor a duty of continuing treatment and care." Without the former element, it might be thought that a physician's omission of treatment where there is a duty of care could toll the statute of limitations on the basis of continuation of negligence or tortious conduct. We were very careful, however, not to adopt, and to point out that we had specifically rejected, the so-called "continuing tort" theory of tolling the statute of limitations as inconsistent with the General Assembly's intent in stating that limitations begin to run "the date of the wrongful act complained of and no other time."

"Continuous treatment" is distinguishable from "continu-

ing tort." The cases in which we rejected the continuing tort doctrine are *Treat* v. *Kreutzer*, 290 Ark. 532, 720 S.W.2d 716 (1986); *Owen* v. *Wilson*, 260 Ark. 21, 537 S.W.2d 543 (1976); and *Williams* v. *Edmondson*, 257 Ark. 837, 250 S.W.2d 260 (1975). See also Note, Torts—Limitations on Actions—Arkansas Adopts Continuous Treatment Rule to Toll State of Limitations in Medical Malpractice Actions, 11 U.A.L.R. L. J. 405 (1989).

In the *Owen* and *Treat* cases the appellants argued that a single negligent act of a physician, a misdiagnosis for example, was a continuing wrong and the statute of limitations would not begin to run until the error was discovered, on the premise that the effect of the wrong was continuous. We declined to adopt that theory, holding the cause of action to accrue at the time of the wrongful *act*. We said to hold otherwise would, in effect, apply the "discovery of injury rule" to our malpractice statute of limitations, which would change the time of the accrual of a cause of action from the time of the act to the date of discovery of the injury. We declined to reach such a result which would have been directly contrary to the legislative intent plainly expressed that the limitation begins to run from the "date of the wrongful act complained of and no other time."

■ In contrast to the so-called continuing tort theory, based on a single negligent act with on-going injury, the continuous treatment doctrine becomes relevant when the medical negligence consists of a negligent act, followed by a continuing course of treatment for the malady which was the object of the negligent treatment or act. That obviously occurred in the *Lane* case.

In *Taylor* v. *Phillips, supra*, the issue was somewhat closer. Dr. Phillips had allegedly been negligent in applying a metal brace to Mr. Taylor's broken jaw more than two years before suit was filed. The brace was not removed until within two years of the filing. Mr. Taylor last consulted Dr. Phillips about his condition on November 4 or 5, 1987. He returned to Dr. Phillips's office, however, December 8, 1987, and was seen by Dr. Phillips's partner, Dr. Modelevsky. On December 9, 1987, Dr. Modelevsky consulted with Dr. Phillips, and they agreed on further surgery involving a bone graft. Suit was filed October 18, 1989. The

majority opinion stated that the two-year period began running December 9, 1987. The opinion stated this was "clearly . . . a continuing course of treatment."

Dr. Eck's allegedly negligent conduct (act) occurred November 30, 1987, when he wrote the prescription. Unlike Ms. Lane and Mr. Taylor, Ms. Tullock had no further contact, direct or indirect, with the doctor with respect to the condition of her breast until the cancer diagnosis had been made by another physician and she returned to Dr. Eck for a biopsy March 30, 1990, more than two years after the alleged negligence occurred. She does not allege any negligence occurred on the occasion of the biopsy or thereafter.

If we were free to adopt the continuing tort theory we might hold that Dr. Eck was not entitled to summary judgment as a matter of law. As we explained in the *Lane* case, however, we feel constrained by the statute in that respect, and if the public policy thus expressed is to be altered, it is up to the General Assembly to do it. The continuous treatment doctrine does not apply in the circumstances of this case, and thus we must affirm the Trial Court's decision on that point.

### c. Constitutionality

Ms. Tullock argues for the first time on appeal that the malpractice limitation is unconstitutional as applied in this case. This argument was not raised before the Trial Court ruled on the motion for summary judgment. It is thus waived under the well-settled rule that even constitutional arguments are waived on appeal unless raised at trial. *Smith* v. *City of Little Rock*, 305 Ark. 168, 806 S.W.2d 371 (1991).

Affirmed.

GLAZE and BROWN, JJ., dissent.

TOM GLAZE, Justice, dissenting. I respectfully dissent. The negligence attributed to Dr. Eck occurred on November 30, 1987, when he prescribed estrogen for Ms. Tullock, although by Tullock's story, Dr. Eck knew at the time that Tullock had a mass in her breast, she had not had a biopsy and she had not been informed of the risks with respect to not having a biopsy. When Tullock saw a different doctor in June of 1989, she discovered that

the mass in her breast was malignant and that the cancer was estrogen dependent. She filed suit against Dr. Eck in December of 1990, which was about three years, one month after Dr. Eck's purported negligence in November of 1987. The statute of limitations for medical malpractice is two years.

Obviously, Dr. Eck's negligence, if any, is barred by the two-year limitation provision unless the facts show Tullock was under Dr. Eck's continued treatment. *Taylor* v. *Phillips*, 304 Ark. 285, 801 S.W.2d 303 (1990); *Lane* v. *Lane*, 295 Ark. 671, 752 S.W.2d 25 (1988). Under such facts, the statute of limitations is tolled until treatment is discontinued.

The facts must be viewed in Ms. Tullock's favor. *See Cordes* v. *Outdoor Living Center, Inc.*, 301 Ark. 26, 781 S.W.2d 31 (1989). In the circumstances of this case, the issue becomes whether Ms. Tullock's continued ingestion of estrogen prescribed by Dr. Eck was continuous-physician treatment which tolled the two-year limitation provision. If so, her suit is timely since she continued taking estrogen until Dr. Eck refused to authorize further refills in June of 1989 when Tullock's prescription expired. On November 30, 1987, Dr. Eck had given Tullock a prescription for estrogen which was refillable in quantities sufficient to provide treatment for at least a year and four months. Tullock obtained those refills on June 9, 1988, and November 10, 1988. I submit Dr. Eck's treatment of Tullock terminated in June 1989, when he refused further medicinal care of Tullock or, for that matter, any type medical care of her.

Stedman's Medical Dictionary, Fifth Lawyers' Edition, defines the term treat as "to manage a disease by medicinal, surgical, or other measures; to care for a patient medically or surgically." And treatment is defined in Stedman's as "medical or surgical management of a patient." In the instant case, Tullock could not have received estrogen without Dr. Eck's authorization. Obviously, in managing Tullock's health and medicinal needs, Dr. Eck exercised his discretion to give her estrogen but later he chose to take that medication from her by refusing any further refills.

The majority opinion cites no cases in point. For example, the case of *Bernado* v. *Ayerest Laboratories*, 470 N.Y.S.2d 395 (A.D. 1 Dept. 1984), held the continuous treatment doctrine did

not apply, but there, the patient undertook self treatment by continuing use of a drug prescribed many years before — long after the prescribing doctor had discontinued treatment. No self treatment exists here. Tullock's position is that she never left Dr. Eck's care. In fact, she had returned to him after her malignancy was diagnosed so Dr. Eck would perform the surgery. An insight as to her continuing treatment by Dr. Eck is Eck's office manager's testimony which indicated that Tullock was a returning patient in March 1990, her file had not been purged and the file was coded as a "periodic reexamination." One physician, Dr. Paul Blaylock, averred that, in his opinion, Dr. Eck's relationship did not end until April 1990, or at least until July 1989 when her prescription for estrogen ran out. In further support of her position, Tullock said that she did not go to any other doctor for estrogen or treatment of any kind until she saw a Dr. Johnson when her cancer was diagnosed. At the minimum, the proof here unquestionably raises a material fact issue as to whether Dr. Eck continued his treatment of Tullock to July 1989 or to April 1990. Either date would make timely the complaint Tullock filed in December 1990.

The majority opinion also mentions *Millbaugh* v. *Gilmore*, 285 N.E.2d 19 (Ohio 1972), where the court held the continuing course of treatment doctrine did not apply where the patient secured a refill of a prescription without the knowledge of the physician and after the physician-patient relationship had ended. Clearly, that is not the situation here.

The other cases cited by the majority are likewise distinguishable. In fact, the rationale related in *Rowntree* v. *Hunsucker*, 833 S.W.2d 103 (Tex. 1992), seems more to support Tullock's, not Dr. Eck's, position. In *Rowntree*, the doctor prescribed Sectrol as a medication for Hunsucker's hypertension. After some visits to the doctor and getting refills, the doctor gave Hunsucker a prescription for Sectrol for a six-month period. About eight months later, she suffered a stroke. The Texas Supreme Court stated the controlling issue for limitation purposes was whether Hunsucker's taking medication on a prescription that the doctor agreed to refill constitutes "a course of treatment" absent any other concomitant medical care, e.g., office visits or related diagnostic services. The Texas court rejected the doctor's assertion that his last examination of a

patient was the triggering event for the statute of limitations in a medical malpractice suit. The court concluded instead that there are some situations in which the *statute would run from the date of the last drug treatment*, if the course of that treatment is the direct cause of the injury. Because Hunsucker failed to allege the drug prescribed by the doctor actually caused Hunsucker harm, it declined to use the last drug treatment to toll the statute.

Here, Tullock's drug treatment ended sometime after March of 1989, and before she sought to renew her prescription in June 1989. In either case, she had two years to bring suit — which she did — to allege that the estrogen she took could have caused the growth of a malignancy she now experiences. In this respect, Tullock specifically alleges here medical condition required a continuous course of monitoring and treatment, but her breast cancer was an estrogen-dependent tumor worsened by Dr. Eck's treatment with estrogen medication. Dr. Blaylock opined the estrogen medication probably aggravated Tullock's underlying medical condition.

In my view, this case has many factual determinations yet to be decided. Dr. Eck's management of Ms. Tullock's medicinal needs and health care clearly, in my estimation, constitute continuing treatment. That being so, I would reverse this cause and return it for further proceedings.

ROBERT L. BROWN, Justice, dissenting. This is a case of summary judgment granted on the basis that Dr. Eck's alleged negligence occurred more than two years prior to the filing of Betty Tullock's complaint. The majority affirms the summary judgment. I disagree.

The facts are that Dr. Eck was aware of a lump in Betty Tullock's breast and recommended a mammogram in November 1987. On November 30, 1987, Dr. Eck wrote a prescription for the drug premarin, an estrogen supplement. Tullock refilled the prescription twice in 1988, pursuant to Dr. Eck's authorization, the last time being November 10, 1988. We can assume for purposes of the motion that she continued taking premarin after refilling the prescription a second time.

Dr. Eck was negligent in prescribing premarin for a patient with a mass in her breast. In March 1990, Tullock was found to

have breast cancer which was estrogen-dependent. She filed her complaint against Dr. Eck for medical malpractice on December 11, 1990.

The majority correctly quotes the limitation statute for medical malpractice that "The date of the accrual of the cause of action shall be the date of the wrongful act complained of and no other time." Ark. Code Ann. § 16-114-203 (1987). A wrongful act, however, and specifically a negligent act, can be an act of commission or omission. *National Fire Ins. Co.* v. *Yellow Cab Co.*, 205 Ark. 953, 171 S.W.2d 927 (1943). For purpose of summary judgment, we must assume that a negligent act was committed, not only by the prescription but by the failure to cancel the prescription or to advise Tullock of the formidable consequences of estrogen ingestion in her condition.

This is not a case of self-prescription by Tullock over an extended period of time. It is a case where the doctor, with knowledge of the patient's condition, negligently prescribed an estrogen supplement for that patient and then negligently failed to stop the prescription.

It was the failure to terminate the prescription that tolls the statute of limitations; that act of omission occurred within two years of filing the complaint. At least, a material question of fact is involved here regarding the failure to terminate the prescription, and reasonable minds could differ as to when Tullock's cause of action accrued. *See McGuire* v. *Ortho Pharmaceutical Corp.*, 60 Ohio App. 3rd 54, 573 N.E.2d 199 (1989) (reversed summary judgment where statute of limitations applied to complaint of vision loss due to medication). I would reverse the summary judgment on the basis that this material question of fact has not been resolved.